**SO ORDERED.**

**SIGNED this 8th day of December, 2016.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge
_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In Re:** | |
| **ALAN JOSEPH MURRAY and CATHERINE ANN MURRAY,** | **CASE NO. 14-22253**<br>**CHAPTER 7** |
| DEBTORS. | |
| **ALAN JOSEPH MURRAY and CATHERINE ANN MURRAY,** | |
| PLAINTIFFS | |
| v. | **ADV. NO. 15-6099** |
| **ECMC (EDUCATIONAL CREDIT MANAGEMENT CORPORATION),** | |
| DEFENDANT. | |

## MEMORANDUM OPINION AND ORDER
## GRANTING PARTIAL DISCHARGE OF STUDENT LOANS

The matter before the Court is the adversary complaint filed by Debtors Alan J. and Catherine A. Murray seeking a determination that excepting the federal student loan debts they owe to the Defendant, Educational Credit Management Corporation (ECMC), from their discharges would impose an undue hardship on them, and, therefore, the loans are dischargeable under 11 U.S.C. § 523(a)(8).[1]  Trial was held,[2] and the Court has carefully weighed the testimony, reviewed the exhibits, and considered the authorities. For the following reasons, the Court holds that the accrued interest on Debtors' student loans is dischargeable, but the original principal amount they owe is not.

**FINDINGS OF FACT.**

Debtors Alan J. and Catherine A. Murray filed a voluntary petition under Chapter 13 on September 23, 2014.  The case was later converted to Chapter 7.  Debtors were granted a discharge on November 25, 2015.  The complaint to determine the dischargeability of Debtors' student loan debt was filed on September 28, 2015.  Trial on the complaint was held on September 22, 2016.  Both Debtors testified, and the Court found their testimony to be forthcoming and credible.

Debtors' Schedule F included two unsecured claims for educational loans, one for $141,774 owed by Catherine, and the other for $120,876 owed by Alan.[3]  The loans are

---

[1] The parties stipulated that venue is proper, the Court has jurisdiction of the parties and the subject matter, and the Court may enter a final judgment.  Doc. 24 at 2.

[2] Debtors appeared in person and by their counsel, George J. Thomas.  Defendant appeared by counsel N. Larry Bork.

[3] The schedule also listed unsecured credit card debt in the amount of $44,448.  Schedule D listed three claims secured by Debtors' former residence which in the aggregate exceeded the stated value of

currently held by Defendant ECMC.

Catherine obtained five loans beginning in 1987 while she was an undergraduate at Benedictine College, and seven loans from 1993 through the spring of 1996 while earning a masters degree in vocal music pedagogy at Arizona State University. In July 1996, before any payments were made, the 12 loans were consolidated into a single loan having a principle balance of $41,883. Catherine obtained no additional student loans.

Alan obtained nine loans between 1988 and 1993 while he was an undergraduate at New Mexico State University, and ten loans from 1993 through 1996 while earning a masters degree in vocal music at Arizona State University. In November 1996, the nineteen loans were consolidated into a single loan having a principal balance of $35,641. Alan obtained no additional loans.

Alan and Catherine were married in 1997. Catherine is 48 years old, and Alan is 49 years old. They have no children, and currently reside in Chanute, Kansas. Neither has any physical or mental impairment.

Catherine testified that she made full student loan payments for herself and Alan for a few months in 1999 and 2000. From 2000 to 2005, Debtors entered into a number of forbearance agreements and made no payments. In 2009 or 2010, Catherine initiated participation in the Income-Based Repayment Plan (IBR Plan), under which payments due were calculated based upon income, adjusted annually. Monthly payments on the

---

$120,000.

3

combined loans were approximately $690 in 2011, $902 in 2012, and $994 in 2013, but these payments, which totaled about $54,000,[4] were insufficient to service the interest accruing at 9%, so the balance due increased notwithstanding the payments. Debtors stopped making the monthly payments under the IBR Plan when they filed for bankruptcy relief in September 2014.

At the time of trial, Alan was employed as a instructor in the music department of Neosho County Community College. His base salary is approximately $36,000 per year. During the school year, his income is usually supplemented by approximately $1,000 per month for additional services,[5] making his estimated annual gross income $48,000. He does not anticipate any increase in his income. Immediately after completing his music education, Alan was employed by his father in a family business. When that business closed, he was employed in the music department of a Kansas City area church and held professional positions with two vocal groups. After his church employment ceased, he was employed by a nonprofit hospice organization. That company closed after about a year, and Alan was unemployed for almost 12 months. In the fall of 2014, he obtained the community college position and relocated to Chanute, Kansas.

Catherine has been employed by Property Valuation Services, located in the Kansas City area, for 13 years. When the bankruptcy was filed, she lived in the Kansas

---

[4] Exhs. KK and LL.

[5] Alan's additional compensation for 2016 will be a one-time payment of $1,485.00, plus $1,020.97 per month while school is in session. Exh. P.

City area and received an annual salary of $58,000 for services as a tax support group manager. In August 2015, she moved to Chanute, Kansas (where her husband had accepted employment and she could work remotely), changed her position to senior data analyst, and agreed to a reduced annual salary of $48,000. She has been advised by her employer that she has no prospects for advancement or salary increases.

Debtors' tax returns reported gross income from employment of approximately $88,000 in 2013, $82,000 in 2014, and $97,000 in 2015. Based upon the evidence concerning their employment, the Court finds that Debtors' estimated annual gross income for 2016 and the future is $95,000, comprised of Catherine's salary of $48,000, Alan's base salary of $35,000, and Alan's extra compensation of $12,000.

Debtors' Schedule I, filed in 2014, reported combined monthly income, after deductions, of $5,568.00. Debtors' pay stubs show that in 2016, Catherine's net monthly compensation was $2,921.84, after deductions for Social Security, taxes, medical insurance, and a $200 voluntary payment to a 401k plan, and Alan's net compensation for a month during which he was paid only his base salary (August 2015) was $2,382.86 after deductions for taxes, pension plan contributions, and medical insurance. Debtors' total net compensation is therefore anticipated to be $5,300 per month plus approximately $800 attributable to Alan's additional irregular income, for a total of $6,100 per month.

The Schedule I Debtors filed in 2014 reported monthly expenses of $5,060. The evidence establishes that Debtors' current monthly expenses have changed, but the evidence was inconsistent about the particulars. The most significant and concrete

change is a reduction of rent from $1,010 to $550 per month because after Catherine's relocation to Chanute, Debtors no longer needed to maintain two residences. Debtors' response to an interrogatory requesting itemization of their average monthly expenses for the last 12 months shows expenses of $5,341.[6] Debtors' response to an interrogatory requesting an itemization of their expected monthly expenses for the next twelve months shows expenses of $5,117,[7] but the Court finds this estimate to be somewhat inflated. The estimate includes $1,000 per month as their transportation expense. Catherine testified that this item is comprised of car payments of $627, plus gas and maintenance, which she estimated to be $100, a figure which the Court finds to be unrealistically low. The Court finds an estimated monthly transportation expense of $825 is reasonable, so the estimated $1,000 monthly expense should be reduced by $175. The Court also concludes that the $1,200 estimated monthly cost of groceries and meals outside the home should be reduced. Catherine testified that the $1,000 per month grocery cost estimate was calculated by assuming a cost of $5 per meal or $30 per person per day. The Court finds this estimate to be more generous than is required for a "minimal" lifestyle and that it should be reduced by $200. Catherine testified that the estimated $600 monthly cost for medicine and other medical or dental costs not covered by insurance was too high. Debtors are in good health, and they stated in response to an interrogatory that the expense had been $200 per month in the past year. The Court finds this item should be

---

[6] Exh. J, interrogatory 18.

[7] *Id.*, interrogatory 19.

Case 15-06099    Doc# 33    Filed 12/08/16    Page 6 of 17

reduced to $300. These adjustments total $675 per month, resulting in estimated monthly expenses of $4,442.

Deduction of the $4,442 estimated monthly expenses from the projected net income of $6,100 yields $1,658 as Debtors' estimated disposable monthly income. This estimate includes no funds for emergencies, no savings for a down payment on a home, no savings for retirement (other than minimal contributions through their employment), and no vacations. It includes only $50 per month for entertainment other than in-home television. It would provide Debtors a minimal or spartan standard of living. Catherine testified that she estimates that Debtors could pay $500 per month on the student loan debt, whereas Alan testified that they had $200 to $300 in monthly disposable income to use for student loan payments.

By affidavits, ECMC provided information about Debtors' student loans and their repayment options under various federal programs. According to loan details attached to the affidavits, as of September 15, 2016, the balance on Alan's loan was $143,390.88 with interest accruing on a principal balance of $123,043.95 at the rate of 9% per year, or $30.32 per day,[8] and the balance on Catherine's loan was $168,178.46 with interest accruing on a principal balance of $144,344.71 at the rate of 9% per year, or $35.57 per day.[9] The total Debtors owed was $311,569.34. Standard repayment of the combined

---

[8] Exh. KK at exh. C.

[9] Exh. LL at exh. C. The per diem rates on both debts appear to have been calculated at an interest rate of less than 9%.

7

loans at 9% interest over 10 years would require monthly payments of $3,945.16, and over 25 years, payments of $2,613.57 per month.[10] Using an adjusted gross income of $96,654 and a family size of two, Debtors' monthly payments under the Revised Pay as You Earn Plan (REPAYE Plan) would be $605.20, and under the IBR Plan, their payments would be $907.80.[11] Under both plans, Debtors' payments would be recalculated annually based upon their adjusted gross income for the previous year.

**ANALYSIS.**

### A. The *Brunner* Test for an Undue Hardship Discharge of Student Loans.

Section 523(a)(8) provides that an educational loan is not dischargeable in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."[12] A debtor seeking to discharge a student loan has the burden to prove that the loan is dischargeable.[13]

The Bankruptcy Code does not define "undue hardship," but the Tenth Circuit has adopted the three-part *Brunner* test,[14] which requires the debtor to prove:

---

[10] Exh. LL at exh. D.

[11] The required annual REPAYE payment is 10% of earnings above 150% of the federal poverty guideline for the applicable family size. The required annual IBR payment is 15% of earnings above 150% of the federal poverty guideline for the applicable family size. Exh. KK.

[12] For purposes of its analysis, the Court treats the separate loans of Alan and Catherine as if they were combined into a single loan. This approach is the same as that taken by ECMC's evidence about the availability and terms of the payment plans. Further, the record contains no evidence of unique factors that would support treating the two loans separately.

[13] *Buckland v. Educational Credit Mgmt. Corp. (In re Buckland)*, 424 B.R. 883, 889 (Bankr. D. Kan. 2010).

[14] *Educational Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004).

8

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.[15]

When it adopted the *Brunner* test, the Tenth Circuit rejected "an overly restrictive interpretation" which had been applied by some courts as failing to "further the Bankruptcy Code's goal of providing a 'fresh start' for the honest but unfortunate debtor"[16] and causing "harsh results for individuals seeking to discharge their student loans."[17] "[T]o better advance the . . . 'fresh start' policy, and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged."[18]

**B. Debtors Cannot Maintain a Minimal Standard of Living If Forced to Repay the Loans in Full, but Can Maintain a Minimal Standard of Living If Forced to Repay Only the Original Principal Balance of the Loans.**

The Court finds that Debtors could not, based on their current income and expenses, maintain a "minimal" standard of living if forced to repay the $311,569.34 they owe on their student loans, but they can maintain such a standard of living while repaying

---

[15] *Id.* at 1307 (*quoting Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2nd Cir. 1987)).

[16] *Id.* at 1308 (citing *Stellwagen v. Clum*, 245 U.S. 605, 617 (1918)).

[17] *Id.*

[18] *Id.* at 1309.

the original principle amount of the loans. A "minimal" standard of living is "living

'within the strictures of a frugal budget in the foreseeable future,'"[19] but does not require

living in "abject poverty."[20] Another court has stated, "a minimal standard of living is a

measure of comfort, supported by a level of income, sufficient to pay the costs of specific

items recognized by both subjective and objective criteria as basic necessities,"[21] and

identified the specific elements as follows:

> This Court believes that a minimal standard of living in modern American society includes these elements:
>
> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.
>
> 2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.
>
> 3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.
>
> 4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay

---

[19] *Innes v. State of Kansas (In re Innes)*, 284 B.R. 496, 504 (D. Kan. 2002) (*quoting In re Ritchie*, 254 B.R. 913, 918 (Bankr. D. Id. 2000)).

[20] *Tennessee Student Assistance Corp. v. Hornsby ( In re Hornsby)*, 144 F.3d 433, 438 (6th Cir. 1998).

[21] *Ivory v. United States (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001).

10

> for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.
>
> 5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.
>
> 6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.[22]

ECMC presented evidence of two payment-in-full options for Debtors' combined loans, one with a ten-year amortization, which would require monthly payments of $3,945, and the other with a twenty-five-year amortization, which would require monthly payments of $2,614. Debtors' maximum disposable income is $1,658 per month. Both options would be highly disruptive and would not allow Debtors to maintain a minimal standard of living. Debtors' budget does not include expenses for anything other than basic items. ECMC has not identified any significant expenses which are excessive, and the Court finds that there are no reasonable changes which would reduce Debtors' expenses so that they could make such payments. Debtors' income has been stable for the last several years; it is not temporarily reduced by health issues or extraordinary events. Both Debtors are in their late forties; there is no suggestion that they have intentionally sought employment below their earning potential. Rather, Alan temporarily

---

[22] *Id.*

11

left the music profession in hopes of increasing his income, but that employment was not successful. Debtors truly cannot afford to pay their loans in full.

In support of its argument that the student loans should not be discharged, ECMC provided evidence of the payments which would be required under two income-based repayment plans if none of the debt is discharged. Under the REPAYE Plan, Debtors' payment would be $605.20 per month, and under the IBR Plan, $907.80 per month, based upon estimated annual income of $96,654. But these monthly payments, although affordable, would not constitute payment of the student loan debt. The payments would not even be sufficient to pay the interest accruing at the rate of $65.89 per day,[23] or approximately $2,004 per month. Debtors' student loan debt would increase, not decrease, under these options. "The question framed by *Brunner* in this first prong is whether [Debtor] can maintain a minimal standard of living if she is required *to repay this loan*, not whether she has any surplus in her budget available for a monthly payment"[24] under one of the income-based repayment plans. Further, although the income-based repayment plans provide for loan forgiveness after making payments for 25 years, at which time Debtors would be in their early seventies, such forgiveness could likely result in a significant tax debt. Forgiveness of debts in bankruptcy does not have federal income tax consequences, but under current law, "forgiveness of a student loan at the end

---

[23] This is the sum of the two per diem rates stated on the loan detail sheets attached to the affidavits admitted as trial exhibits on behalf of ECMC.

[24] *Durrani v. Educational Credit Mgmt. Corp. (In re Durrani)*, 311 B.R. 496, 505 (Bankr. N.D. Ill. 2004) (emphasis in original), *aff'd* 320 B.R. 357 (N.D. Ill. 2005).

of the IBRP period is taxable in the same way as forgiveness of any other debt outside bankruptcy. That is, to the extent a debtor's assets exceed liabilities after the forgiveness, the forgiven debt is taxable income."[25]

The Court rejects the availability of repayment plans as a basis for finding Debtors' net income to be sufficient to repay the loans while maintaining a minimal standard of living. The Tenth Circuit has admonished that the *Brunner* factors should not be applied in an overly restrictive manner that fails to further the Bankruptcy Code's goal of providing a fresh start for the honest but unfortunate debtor. Entry into one of the affordable repayment plans would not provide Debtors with a fresh start; they would be burdened by a continually-increasing debt of over $300,000, which could impact the availability of housing and credit.

But in the Tenth Circuit, as in many circuits, the dischargeability of student loans is not an all-or-nothing proposition. When a debtor shows that the requirements of § 523(a)(8) have been satisfied for a portion of the student loan debt, the bankruptcy court may exercise its equitable powers under § 105(a) and discharge just that portion of the debt.[26]

In this case, the Court finds that Debtors' income and expenses are such that they can afford to pay approximately $900 per month on the student loan obligations while

---

[25] *Abney v. United States Dep't of Educ. (In re Abney)*, 540 B.R. 681, 689 (Bankr. W.D. Mo. 2015).

[26] *Alderete v. Educational Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1207 (10th Cir. 2005) (*citing Saxman v. Department of Educ. (In re Saxman)*, 325 F. 3d 1168, 1175 (9th Cir. 2003)).

maintaining a minimal standard of living. That payment is more than Debtors testified they could pay and is approximately the same amount as required under the IBR Plan, but forgiveness of the accrued interest will allow Debtors to actually repay the loans, not merely to pay a portion of the accruing interest. Such payments would be sufficient to pay the original principal of the loans ($77,524), with interest at 9% per year, in slightly less than 12 years, when Debtors will be approximately 60 years old.

Presently, the accrued interest is approximately 75% of the student loan debt. The foregoing analysis finding that Debtors cannot pay the entire student loan debt and maintain a minimal standard of living is equally applicable to the accrued interest portion of the debt. Monthly interest on that portion of the debt ($234,045.34) at 9% is $1,755.34 per month and monthly payments to amortize the debt over 30 years would be $1,883.18. The Court finds that if Debtors remain liable for the accrued interest, they cannot pay the obligation and maintain a minimal standard of living, but they can maintain such a standard if they are required to repay only the principle of $77,524. By discharging the accrued interest, Debtors will be afforded a fresh start because their remaining student loan debt will be a manageable amount.

### C. Additional Circumstances Indicate that Debtors' Present State of Affairs Is Likely to Persist for a Significant Portion of the Repayment Period for the Accrued Interest Portion of their Student Loan Debt.

The second *Brunner* factor considers "whether there are other circumstances making it likely that the debtor will not be able to pay his loans for a significant portion of

the repayment period."[27] This requirement recognizes that a loan should not be discharged when a recent graduate's salary is so low that payment is difficult at the present but it is also clear that the salary will increase in the future.[28] In applying this prong, a court must make a "realistic look . . . into debtor's circumstances"[29] and base its "'estimation of a debtor's prospects on specific articulable facts, not unfounded optimism.'"[30]

In this case, the second factor is satisfied. Debtors will not be able to pay the accrued interest on their loans in the foreseeable future. They are not recent graduates. They borrowed funds for educational purposes approximately 20 years ago. They are now in their late forties. Catherine has been told by her employer that she should expect no raises or promotions. Alan is employed by a community college whose funding is controlled by the state legislature, making salary increases unlikely. Debtors' expenses for medicines and other medical and dental care are likely to increase as they age. There is no evidence that any of the enumerated expenses is likely to decrease.

### D. Debtors Made Good Faith Efforts to Repay the Loans.

Debtors have paid over $54,000 on their student loan debt. Since the loans were originated, they have been in payment, deferral, or forbearance status. Debtors' payment

---

[27] *In re Alderete*, 412 F.3d at 1205.

[28] *Id*.

[29] *In re Polleys*, 356 F.3d at 1310.

[30] *Id*. (*quoting* Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L. Rev. 139, 197 (1996)).

histories do not include any late charges.[31]

In approximately 2010, Catherine initiated inquiries which resulted in Debtors' entering into the IBR Plan, and Debtors continued to make payments under that plan until they filed for bankruptcy protection in 2014. Under the IBR Plan, Debtors' payments were credited to accrued interest but were insufficient to stop the accrual of more interest. The longer Debtors paid under the IBR Plan, the more they owed.

The circumstances which have resulted in Debtors' inability to pay the accrued interest resulted from factors beyond their immediate control. The primary cause is the low earning potential of people with masters degrees in music.

For the reasons discussed above, Debtors' refusal to voluntarily continue to pay under the IBR Plan as an alternative to trying to discharge the full amount they owe on their student loans does not show an absence of good faith efforts to pay. The magnitude of their student loan debt, the high interest rate, and Debtors' moderate earning potential created a "perfect storm" where the IBR Plan and similar plans were simply unproductive alternatives.

**CONCLUSION.**

For the foregoing reasons, the Court finds that the accrued interest on Debtors' student loans is dischargeable. Requiring payment of that portion of the loan debt would impose an undue hardship on Debtors. Based upon their current income and expenses,

---

[31] Exhs. CC and DD.

Debtors cannot maintain a minimal standard of living if they are required to pay the accrued interest, additional circumstances indicate this state of affairs will continue into the foreseeable future, and Debtors made good faith efforts to repay the loans, including interest. Accordingly, the debt for the accrued interest on Debtors' student loans is discharged, but Debtors' liability for the original principle of the student loans in the amount of $77,524 is not discharged.[32]

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

# # #

---

[32] Although the parties have not raised the issue, the Court assumes the interest rate on the debt excepted from discharge will be 9% and such debt will be considered a federal student loan to the same extent it would have been if the Court had found the entire debt to be excepted from discharge. No interest shall accrue on the nondischarged loan principal until the date this Court's judgment deciding the dischargeability question is entered.